AVIATION & GENERAL INSURANCE v. United States Is it Mr. Perlis? Perlis, please proceed. Good morning. Judge Wheeler's principal error in the appeal before you is that he adopts the government's argument that the Fifth Amendment does not distinguish between plaintiff's takings claim and the matter of Alimon Estiano, which is a sister case arising out of the same espousal, which is currently being briefed before this circuit. In Alimon Estiano, we have a circumstance which is very much like Abihim Yahi, and there you have a circumstance in which plaintiffs receive compensation under an espousal and are simply dissatisfied with the outcome. Plaintiffs in those circumstances really fail to understand that an espousal is inherently a compromise of private party claims negotiated on a government-to-government basis. What happened in this case or to these particular plaintiffs is very different and very unforeseeable when looked at from the context of the history of espousal practice in the United States. In this case, plaintiffs' claims were successfully espoused. The claims were effectively sold to the government of Libya as part of a package of claims in which the government of the United States received a total of $1.5 billion. Then plaintiffs' prorated share or appropriate share of that $1.5 billion was used entirely for purposes other than to compensate the claimants. It was used to compensate other claimants. It was used to compensate other claimants. For example, $209 million of the $1.5 billion was used to compensate plaintiffs who had never filed claims against the government of Libya in proceedings before district courts. There are many other examples of internal ways in which that money might have been distributed differently. For example, in the 9-11 Victims' Compensation Fund and in the current state-sponsored Terrorism Victims Fund, there's a collateral offset. My understanding is that the money was allocated for claims of U.S. nationals. Is that right? The money was allocated for the claims of U.S. nationals who were natural persons or largely natural persons. For example, the claimant here, New York Marine, is a U.S. corporation headquartered in New York. The other claimant here, the Aviation General of a British company, stands in the shoes of Pan American World Airways, which is also a U.S. corporation. What happened here and what is unprecedented in espousal law going back perhaps 100 years, certainly as early as the sinking of the Lusitania, was the successful espousal of a claim as a foreign policy matter. During the domestic distribution process, quite apart from the international relations portion of the espousal, the funds that were supposed to be used for one claimant were used entirely for the benefit of additional claimants. It is very much analogous to what the Supreme Court addressed in Lingle when it talked about parties bearing unfair burden as the government carried out some public policy. What was your property interest that was taken? There is a property interest. Both the Alimon Estiano court and this court held that the actions filed before the U.S. District Court for the District of Columbia were property interests, and that's consistent with the long line of cases. Your property interests arise from the subjugation clause in the underlying insurance contracts, correct? In the case of New York Marine, under insurance law, they wind up owning the hull of the aircraft, so their property claim arises from the destroyed hull of the aircraft. In the case of aviation in general, it is as you just stated. It's a subjugation claim? It's a subjugation claim. When those contracts were entered into, Allied did not have any reasonable expectation of being able to sue on those subjugation clauses if the tortfeasor was a hostile foreign nation. I have the largest portfolio of those kinds of claims in the United States. At all times, those insurance carriers and the individual plaintiffs on the Lockerbie aircraft maintained those claims with the expectation that they would be successful. Certainly, the Lockerbie plaintiffs were successful. I know that the insured had claims. Their claims accrued when the Lockerbie jetliner was bombed, but as far as your interest is concerned, Allies, when the underlying insurance contracts were entered into, you had no expectation of being able to subjugate against a hostile nation. I think there was an expectation that there would be litigation against that hostile nation going back all the way to the mid-1980s when that act occurred. There was no right to file a lawsuit at that time, right? Libya had sovereign immunity. It wasn't on the state-sponsored list of terrorists in 1980. That didn't happen until 2008. I'm sorry? Libya wasn't a state sponsor on the list of terrorist countries that was deprived of sovereign immunity in the United States under the statute at the time of the attack. No, Libya has been on the terrorist list for a substantial period of time. Not in 1980 when these acts occurred. When these claims accrued in the early 1980s, Libya had sovereign immunity in the United States from being sued. I don't understand. You're looking at me like I'm confused. I'm sorry. A cause of action against a foreign sovereign for an act of terrorism accrues if the sovereign was either on the list of state-sponsored terrorism at the time of the attack or if it was added to the list in part as a result of that attack. It's a two-pronged test. There's no question that Libya has been on the list of state-sponsored terrorism as a result of the bombing of Lockerbie and many other attacks that took place. Let's get an underlying issue settled here. At the time of the attack, Libya was a state sponsor of terrorism, but it had sovereign immunity at the time that the insurance contracts were entered into. Libya had immunity. Well, I think the better way to look at it is Libya's immunity, Iran's immunity came under attack in the United States really from the mid-1980s. At the time that the contracts were entered into, Libya had sovereign immunity from lawsuits being brought against it by U.S. nationals. In retrospect, that is correct, but those claims were continuously prosecuted. We're looking at an insurance contract, and I'm asking you, when that contract was entered into, Libya enjoyed sovereign immunity. Yes. Going back to my question from earlier, I was asking you what the property interest is, because in your blue brief, I find it confusing when you have a header that says, plaintiffs do not allege that the sale of their claims to Libya was a taking, but are challenging defendants' decision to exclude them from the distribution of those proceeds. Well, you certainly didn't have a vested property interest in actual proceeds in the settlement. I mean, that can't even reasonably be argued. I understood your property interest as alleged below to be your property interest in the lawsuit that you filed and getting to continue that suit. Am I mistaken? Because you have to have a vested property interest. I think there's a question of whether your current claim, even at the state it was in, is a vested property interest. But putting that aside, your vested property interest can't be in some portion of the settlement.  We have a property interest in the claims that were pending in the U.S. District Court for the District of Columbia at the time the espousal was entered into. The underlying interest for those claims is, in the case of New York Marine, is an aircraft hull. And in the case of the other insurance carrier, is the subrogation claim that it has on behalf of Pan American World Airways. So you're not claiming that your property interest, as you allege in your brief as the header on page 26, when you say we're not challenging the sale of the claims, but we're challenging defendants' decision to exclude them from the distribution of the proceeds. That's not an accurate header? It doesn't really reflect what you think your property interest is, correct? What that header was supposed to explain is we are not challenging the right of the United States to engage in that espousal and to sell those claims to the government of Libya. We are challenging the domestic distribution mechanism that arose after the completion of the espousal. So your interest in that distribution is that you possess a legal cause of action? That is correct. Right? Yes. Okay, so when Congress later amended the act, it terminated all proceedings that are being brought in U.S. courts against Libya. That is correct. Why can't we view that, or what's to prevent us from viewing that as having terminated your cause of action? And this doesn't have anything to do with the right to a distribution or the manner in which the funds were ultimately distributed. I'm just focusing again on the cause of action. You can't view them as separate actions. Congress terminated the right of all... Congress gave you a cause of action. Congress gave us a cause of action. And then took it away. And then it took it away subject to a successful espousal. That termination has a condition subsequent in it. So are you saying that Congress left you without a legal remedy? No. I'm saying that Congress left these plaintiffs with a legal remedy. The legal remedy was the espousal. In fact, the termination doesn't become effective until the executive certifies to Congress. Is it your view that the United States government could not have settled, could not have changed the jurisdictional rule regarding sovereign immunity of Libya, and thus failed to allow suits to go forward? And what if at that time, in the course of the settlement, the president had decided that we will take this money only to compensate U.S. nationals who lost property directly? Not their insured companies, not corporations, and not foreigners of any type. Are you suggesting that that would not be a proper act by the president and would amount to a taking? I'm sorry. When you say property, you mean wrongful death and personal injury claims of individuals? I mean any type of claim that a U.S. national has as a result of having been harmed by the terrorist acts. Let me make sure I understand your fact pattern. My fact pattern is, could the president have excluded foreigners from receiving a part of the settlement as part of the agreement he reached with Libya when he decided to terminate all claims that were possible against Libya by removing them under 1605A from the state-sponsored list of terrorists? Could the president, did he have the authority to say, we're going to eliminate the ability to sue in U.S. courts, and the settlement will only go to U.S. citizens? Does the president have that power? Yes or no? He clearly does. You can't say no. Of course he's got that power. So then the next question is, is it a taking of the foreign government? The answer is yes, he could have done that, but he could not have done that without implicating a takings claim if the foreign national held a justiciable claim in controversy under, in this case it would be 28 U.S.C. 1605, either A7 or Big A, which are the terrorism provisions of the Foreign Sovereign Immunities Act. Where Congress has given, has created subject matter jurisdiction and created a federal cause of action, which both U.S. nationals and certain specially designated foreign nationals can avail themselves of, that subject matter jurisdiction and cause of action cannot be terminated without implicating a takings claim. And that's because that's your property interest, a cause of action. Because that's correct. But doesn't that property interest continue? You still have avenues by which to pursue your lawsuits. There are no avenues by which those. I mean, to file a lawsuit, I don't know if they'll proceed. Well, under Rule 11, I can't bring another action. Not here, but in other countries. Well, first, the statute of limitations has long expired. We may not be able to create subject matter jurisdiction. The government talks about the continuous nationality rule and apply that to insurance companies here. If you're talking about New York Marine, which insured an Egyptian Hull aircraft, if it went to Egypt and Egypt applied the same test that the U.S. applied, there'd be no remedy. Similarly, if you- If you and Egypt applied the same test, the test is not a legal test. That is a test that was formulated solely for purposes of distribution of the settlement arrangement. So Egypt does not presumably have a similar settlement arrangement with Libya. So that's not some legal doctrine that precludes a lawsuit in general. It's just simply the terms of the settlement. That's how Bush and the Commission ultimately decided that settlement proceeds would be distributed in that pattern. So why couldn't you bring a lawsuit in Egypt or anywhere else? You've got foreign companies that want to sue the country of Libya for hijacking planes. None of these events occurred in the U.S. Your companies are not in general recognized as U.S. companies with one exception. One exception. And, you know, it's an act against a foreign government. Why does that have to be here in the United States? It seems like Judge Reyna's question is actually completely correct, which is don't you have the right to bring lawsuits in foreign countries? And my question is, don't they actually belong there? There is no remedy in Egypt for U.S. Marines. There is no remedy in the United Kingdom for aviation in general. That simply isn't going to happen. This is the end of those claims. The answer to your question and why insurance companies and other property owners are allowed to proceed in terror victim claims is when Congress created that statute, it recognized that there are wrongful death claims that result from terrorist attacks. There are personal injury claims that result from terrorist attacks, and there are also massive property claims that result from terrorist attacks. What Congress wanted to do is to compensate property owners where the intended victims of the attack were U.S. nationals. So if you are the property owner of an aircraft and there is a terrorist attack on that aircraft targeting U.S. nationals, for example, in the incident involving the hull that U.S. Marines insured, every U.S. national on that airplane was parked on the ground. It's not being allowed to take off. The U.S. nationals on that airplane... You're talking about what Congress wanted. Congress made the change here. This isn't like some of the other cases where it was done by executive order. Libya was removed from the statute by Congress. So isn't what Congress wanted most clearly articulated by the statute that they enacted, and in this case, the removal of Libya, i.e., giving Libya back sovereign immunity. Congress knew well when it did that that it was eliminating all of these claims. Why isn't that the best example of what Congress wanted? I'm sorry. I'm going to get to that. The U.S. nationals on that aircraft were shot. Well, you're out of time, and you've used all your rebuttal time, so you should get to the answer to my question quickly. I'm sorry. Excuse me. Congress wanted every claim against Libya terminated, and it has the right to do that. We supported that. Congress wanted these claims, and the executive wanted these claims espoused, and we supported that. In fact, I went to a D.C. bar luncheon with the legal advisor talking about this and complimenting the Department of State for the work it had done here. What we are complaining about is the post-espousal process. They took funds that should have been in part allocated to these insurers, and they gave them entirely to other parties. But as part of Congress's scheme, they decided that the funds would go to certain parties, and the question came up, why couldn't they do that? Congress left it to the discretion of the executive how those funds were to be distributed. You have no property right in any portion of that settlement. That's what I wanted to arrange with you and make sure we understood at the beginning of this. That's why I've asked you three questions about it. Your property interest is in a claim, a legal claim, that you believe you had a right to see through to its termination. You have no property, no vested property right in some portion of that settlement agreement. So when you keep returning to the idea that our complaint is the post-espousal distribution, bells go off in my head because you've got no property right to the post-espousal distribution. Your property right is limited to your legal claim and seeing it through to conclusion, if you have one at all. But if you take that to its logical conclusion, it means that any party who has agreed to have their claims espoused as part of a package of claims is at risk for having the proceeds of that espousal that is normally prorated over claims. Your problem is there are proceeds. Bush could have done this for free. Bush could have decided to avoid war with Libya. We need to terminate all of these claims and we need to restore Libya's sovereign immunity. And they could have done it and not required Libya to give a single penny. And then you'd have the same argument. We have a taking. We had a legal property right. Our property right was the lawsuit. You can't link your property right to how the government ultimately distributed the settlement agreement with the settlement proceeds from the commission because Bush could have done this for free. You don't have a vested property right in the settlement. Your property right is limited to your claim. The only time that a president has acted like that was in ACRI. And what happened in ACRI was takings claims were filed. They were stayed. There was an espousal and people were subsequently compensated. This is the only time that we can ascertain where claims were espoused and proceeds of that espousal were used entirely to compensate third parties. I want to follow up to Judge Stoll's questions to you. So your main complaint is how the funds were distributed. You kind of want us to look aside with respect to what happened to your cause of action, et cetera. Let me finish. I'm almost done. So you want us to take a look at how the funds were distributed and the fact that you didn't get any money was that was the taking. Now, the problem I have with that is that that seems to me to be a political question. And that would be one that I would not want to get into. The court cannot second guess the president or undermine its policy objectives. That's contrary to separation of powers. I would answer that by directing you to the Supreme Court's decision in Lingle. The government had certain purposes that it wanted to apply those funds to. But it terminated these claims. It has left these people without a remedy. I would argue that they are entitled to a portion of the funds which were driven by the successful espousal. Otherwise, you wind up in a circumstance which is really untenable. Suppose I'm sitting with the Department of State next week organizing another espousal. If I don't know, if my clients don't have a property interest in that espousal, how do I counsel a client to participate? I recommend it to people that they participate in this program. How do I do that in the future? It creates an absolutely impossible circumstance and one that has never occurred in the United States before. The circumstance here is unforeseeable and unique. Can I move on to another aspect of the case? Sure, I'm sorry. I do apologize for running over. I wanted to ask you about some of the language in the court's opinion, which is talking about it's skeptical that plaintiffs would have been able to collect on the judgment and questioning whether there's a reasonable expectation here. I just want your response to that. I do a great deal of this work. People might say I had some cases against Bashir Assad for the beheading of two U.S. nationals. Some people were skeptical that I could ever enforce that judgment. I wasn't skeptical. All of this in the record because the lower court decided a case. So you telling me about anecdotes from your personal experience, unless it's part of the record, it's not relevant to whether or not that decision by the lower court is supported such that we have to affirm it. You have to admit that all litigation is, you know, there's some, it's hard to have a reasonable expectation of success in litigation. Litigation is, I mean, it's a situation where you could win, you could lose. There are lots of things happen. The cases were not that far along at the time that they ended and terminated. So I just thought that that was an interesting point by the court below. It seems like it wouldn't be difficult to have a reasonable expectation of success in a litigation and to expect that you would collect money even if you were successful against the government of Libya. I don't want to run afoul of Judge Moore's head. I mean, if you've got something in the record to say in response to it, it's just that it doesn't help as much if you're going to stand here and talk about, you know, different cases. But if you have something in the record you could direct us to or a legal argument, that would be helpful. This is a well-established body of law. There are many cases in this body of law where judgments have been won and successfully enforced. I've done a number of them. Again, I want to be careful about Judge Moore's admonition. But this is now a fairly regularized body of law. Judgments have been successfully brought against or settled, either successfully brought or enforced or settled against Iran, Libya, Syria. It's a regular, certainly it's a regular part of my practice. I was never troubled by the enforceability question. Mr. Perlis, we need to hear from opposing counsel. Mr. Preheim or Ms. Preheim. I recognize that I've run well over time. May I reserve two minutes for rebuttal, Your Honor? Yes. Thank you. Good morning, and may it please the Court. The Court should affirm the trial court's judgment. In addition to the fact that we respectfully submit this case is not justiciable, aviation doesn't possess a cognizable property interest here. And even if it did, no taking occurred. Why isn't a subrogated right cognizable? Well, first, what they seem to be focusing here on is the apportionment of the settlement proceeds. They don't have any property interest in the settlement proceeds. I'm not talking about the proceeds. Right. With respect to their argument regarding the contract, here keep in mind that they could only bring these legal claims under 1605 capital A for a short period of time and only because of that federal statute. That really puts this case within the ambit of the Adams case, where the claim was one of the statute. I was asking counsel about the timing of the effective date of the insurance policies and the date of occurrence. But it's the case that in all the insurance contracts, the subrogated right doesn't accrue until the company pays out on the policy. So in this case, an insurance company never knows in what context that right can arise in. It could be an auto accident or, in this case, it was the bombing of an aircraft, and that's when the subrogated, as soon as they paid out, they have an interest. They now stand in the shoes. That's what subrogation means. They now stand in the shoes of the insured. If the insured has a cause of action or a right to the proceed, then why doesn't the company? Well, this court held in Adams that not all legal claims are cognizable property for takings purposes. The claims actually have to be seeking to protect real property, physical property, or intellectual property. Their claims here were not seeking to protect any of those three. Rather, they were, in essence, tort claims based entirely upon a federal statute. So one company it was, they insured the hull of the airplane. Right, but the hull had already been destroyed. They weren't seeking to protect the hull at that time. It had already been destroyed. They were seeking to recover losses they incurred as a result of the destruction of the hull. How is that not a legally cognizable property interest? Well, first and foremost— It's destruction of actual real property. Well, because they weren't seeking to protect that property. It had already been destroyed. But the takings is always about that, right? A taking isn't affirmatively seeking to protect property. It's to recover loss when the property is taken. Well, but we're talking about it within the context of legal claims here. And I think the important point is they could only bring their legal claim because of a federal statute. That's very similar to Adams where it was an administrative claim that could only be brought because of a federal statute. You mean the jurisdictional statute that waived Libya's sovereign immunity. That's the federal statute you're talking about. Right, exactly, 1605 capital A. And that only existed for approximately six months with respect to Libya. They don't have any property interest in jurisdictional rules. They certainly don't have any property interest in rules of sovereign immunity remaining static. What about the cause of action? The cause of action itself? Well, but the cause of action was affected because of the alteration of a jurisdictional rule. Right, but that created a cause of action. And you're dealing with a subrogated claim. So why doesn't that create a property interest? Well, because it's very similar to Adams. It's a statutory-based claim. The right is based entirely upon a federal statute. There's no dispute that they couldn't proceed with their claims against Libya but for 1605 capital A. And that puts it within the ambit of Adams. We respectfully submit. Moreover, the bundle of sticks in their legal claims doesn't include the unfettered right to sue foreign countries. That's what this court said in Abraham-Urey. And the Supreme Court in Dames and Moore noted that, in that case, the attachment of foreign states' assets were not property because they were subordinate to the president's power over those assets. Okay, I think we have your property interest argument. Would you move on to defending the other bases, the bases upon which the lower court actually decided in your favor? Certainly. With respect to whether or not a taking occurred, we submit that the lack of any reasonable investment-backed expectation here in and of itself is grounds for denying the claim. There are two reasons why aviation doesn't possess a reasonable investment-backed expectation. The first is that rules of sovereign immunity can be changed at any time. In fact, here we know that they did change a number of times over a period of years. And the Supreme Court in Beatty made that point. The parties can't have any expectation rules of sovereign immunity remaining static over time. Now, the second reason why they don't have a reasonable investment-backed expectation is a more general proposition, and that is we know that the president can settle claims and has done so since, as the Supreme Court noted in Dames and Moore, since at least 1799, so effectively since the founding of our country. The president has settled claims. So for that reason, they don't have any reasonable investment-backed expectation. Now, to avoid that result, they seem… But you talk about the president can settle claims. Usually when a claim is settled, each side gets something. That's the nature of settlement. Usually settlement is not completely one-sided. That's a tough thing for a lawyer to pitch to his client as a win, right? You know, good news. We settled. You got nothing. Well, a couple of points. First, in the Belk case, although the U.S. hostages were released as a result of that agreement, they received nothing, no compensation. Nothing. They were released. They received no compensation. My favorite line in that opinion is, would you have hesitated for one one-millionth of a second if, while you were being held hostage, they said, the president can let you go free now, but you've got to give up your right to a future compensation lawsuit? Or would you have rather stayed in place so he negotiated a better settlement? I mean, you know, that's a big get. We got you free. These people don't get their lives back. Obviously, that was obviously a very significant benefit that they received. But we respectfully submit that that benefit is very different from actually being able to obtain compensation from Iran for being unlawfully held. And they received no compensation as a result of the settlement. And this court said, nonetheless, and these were U.S. citizens, nonetheless, that that is not a taking. No, because they said, the court clearly throughout based its decision, it's not a taking, on the fact that you definitely got something. You got something big. You got release. Right. But our point is that there are instances. There was compensation. There was a settlement. We each got something. Well, they certainly benefited, but there certainly wasn't monetary compensation. But we have other cases, Shanghai Power, I believe, for example, where the plaintiff in that case received a small fraction of the value. Right. But here they got nothing. There's a difference. That's what settlement is, right? Settlement is you give away. You don't get everything you want, but you usually get something. Right. They got something. They didn't get everything they wanted. Here they got nothing. As we pointed out, they certainly have the right to seek relief through their home country. These are British companies with one exception. There's nothing that prevents them from going to Britain, asking that Britain enter into a settlement and include them in it. But isn't it true that all of the U.S. cases that you've cited, they got something. They may not have gotten money when they got their freedom. They might not have gotten as much money as they wanted when they got something. But in every case I could find that was related to this, the settlement, they got something. They didn't get zilch. They certainly did get something, but we respectfully submit that that shouldn't be the dispositive factor, whether or not you can bring a takings claim just because you received something. For example, the Shanghai case, they received a small fraction of the value of what they asserted was the value of their claim. So if we had paid aviation a dollar, would that mean that they can no longer bring a takings claim? No, it just might mean that that is reasonable compensation for what they lost. Right? I mean, that's what a takings claim is about, is ensuring were you adequately compensated for the burden you bore at the behest of the public. And I think the hostages would argue and felt that they weren't adequately compensated. Merely by being released, that's different from actually obtaining compensation from Iran for the harm that they incurred. Now, in order to avoid the lack of any reasonable investment expectation, aviation focuses on the claims process itself. It says we should have received compensation from that process. Of course, this court in Belk said that the lack of an alternative forum alone does not constitute a taking. Can we go back? You said there were two reasons why this case can be resolved entirely on reasonable investment-backed expectations. And your first one was that sovereign immunity rules are inherently uncertain. I mean, does that – I find that difficult because just because rules are uncertain, you should – and in situations where every case that has ever been written goes to great pains to say these people got something. They may not have gotten as much as they wanted, but they got something. Is it really unreasonable for them to think that their lawsuit would result in something? Well, I think I'd also point out that I believe in all those cases you were talking about U.S. nationals who obtained something as a result of the settlement. Yeah, the Supreme Court said in pink, though, expressly, to be sure, aliens as well as citizens are entitled to the protection of the Fifth Amendment. Right, absolutely. And the Supreme Court also said in that case that the United States doesn't have to act as a collection agent for foreign nationals. And that's effectively what they're seeking here. It doesn't have to act as a collection agent, but when it does effectively settle their suit – Well, but what they're saying is that if you give us the right to sue Libya, even for here, a six-month period of time, and as foreign companies, you, the United States, can't settle our claims without either including us in the settlement process or paying us money or effecting a taking. Now, that's an extraordinary proposition. When we talk about fairness and justice, should the United States taxpayer be held liable, be held responsible for Libya's acts of terror? That's effectively what aviation seeks here. No, I think they're just looking for a piece of the pie. Well, right. And they have a subrogation claim. And an insured has been injured or killed. They now stand in the shoes of the insured. And they're saying, where's my – I paid out. They paid out to the victims under the policy. And by operation of law, they stand in the shoes of the insured. And they're saying, you settled this case without us. You didn't give us anything. But yet, we stand in the shoes of the insured. Right. But when we talk about claims against foreign countries, parties are put on notice. Parties know that if they obtain a claim against a foreign country, that claim may be settled, and the settlement may not be in their best interest. It's entirely fortuitous who may benefit and who may be harmed as a result of that settlement. And there's no requirement the United States include foreign companies in any settlement and provide payment for those companies. There's nothing that prevents aviation from going to Britain, their home country, and seeking relief from Britain through a similar settlement process. You focus entirely on investment-backed expectations. Do you want to speak to any of the other factors, the Penn Central factors, character of the government action? Do you want to – because I think that the Court of Federal Claims really decided in the government's favor on each factor. But I don't want you to hinge your entire argument on only one. Right. We respectfully submit that the other two factors also weigh heavily in favor of the government. When you talk about the character of the government action, there's no dispute that the president has longstanding authority to settle claims like this. If we go as far as Allied wants us to in this case and actually look at whether property interest was taken by not giving them any compensation, if we go that far, are we dealing with a political question at that point? Yes, I think so. And that's why we submit the case is not justiciable. Really what they're challenging is the distribution of funds here. And they are, in fact, challenging the settlement as well. I mean, they're saying either include us in the settlement or don't include us and let us continue with our lawsuit. And that's a challenge directly to the settlement in terms of the settlement agreement. Or provide us, the settlement should have provided us with some sort of funds. And there are significant implications, not just for this case, but for future situations. Again, if the United States has to pay for foreign entities that have legal claims, even if they have claims for a short period of time, if we have to include them in settlements, that may mean that in future situations, negotiations with foreign countries, the United States may not be able to reinstitute relations. It may be too costly to do so, for example. So there are significant implications, not just within the confines of this case, but for future. I have a problem. Why is it that the government at that point can't simply say, you know, you're drawing up a list. Part of the list is this is what the insurance companies have paid out. Surely they're going to seek to move on the subrogated interest. This is our potential liability here. We need to include this in the negotiations. Well, respectfully, there are lots of factors that go into negotiations when you're talking about foreign relations. Then you say, you know, they represent the subrogated interest represents 5% of all claims. If it's, you know, a dollar, then they get five cents. They didn't get anything. That's certainly one way you could do it. But one could also say that we have a set amount of money that we can provide as part of the settlement. And we have to decide who that money is going to go to. And that U.S. nationals should take. You say we're not going to give the subrogated interest any money. Why isn't that a taking? Well, it's not a legal claim. Well, they have no right. They have no right to the settlement proceeds themselves. And even with respect to the legal claim, again, it was impacted through the alteration of a jurisdictional rule of sovereign immunity. They don't have any property interest in rules of sovereign immunity remaining static. Going back to the Penn Central factors, should those all be considered by the court below? Is it appropriate just to rely on reasonable investment-backed expectation or loan? Or do all the factors have to be balanced and considered? Well, we do believe that all the factors weigh in the government's favor here. But certainly, yes, the court can decide just based on reasonable investment-backed expectations alone. In the Monsanto case, the Supreme Court said that the weight of that factor alone was so dispositive that it resolved the case on that factor alone. So, yes, a court can look to just that factor. But with respect to the character of the government action, this court in Roseacre made clear that you still do consider the public purpose of the action. You don't simply consider how the government action has affected the plans. Now, that certainly is part of the inquiry. But as we pointed out, they weren't singled out here. Aviation wasn't singled out. It was treated just like any other – they were treated just like any other foreign insurance company. The Libya Claims Resolution Act applies to everyone. The commission's rules apply to everyone. You're treated just like any other foreign insurance company. You're not singled out. I'm going to treat you exactly like a government lawyer wearing glasses and a blue tie and a white shirt. And, you know, you don't see the problem with that argument. They weren't singled out. We're just going to exclude all people of a certain color. How does that not make you singled out? It sounds dideophobic to me. In Roseacre, it was egg producers. And even then, I believe it wasn't all egg producers. But this court said, you're not being singled out because it applies to most egg producers. Well, here, the Libya Claims Resolution Act applied to everyone. No one could bring claims against Libya once that act had been passed by Congress and the certification had been made. It applied to most egg producers. I mean, I must be honest, I don't remember the Roseacre case really well. But I do remember that that case had something to do with the bacteria on the outside of the egg shell. So if it applied to all egg producers, it seems like that applies to everyone in the relevant community who would be affected by bacteria on the outside of the egg shell. I mean, of course you wouldn't apply that to meat producers. It's not the same issue here. Tell me, how would the government be arguing this case if this were not foreign companies who were the insureds, but the families of the hijacked victims who were U.S. nationals who were killed? How would your argument, would they have a takings claim here if the government had eliminated their right to sue Libya? If those individuals brought suits within the six-month period of time, and then the president settled that case, eliminating their claims, would those individual U.S. citizens, the families of the deceased hijacked victims, have a takings claim? No, they wouldn't, for the same reason that the U.S. nationals held hostage by Iran didn't have a takings claim. Wait a minute then. So your whole argument about these are foreign companies trying to get the U.S. to pay for Libya's acts of terrorism was really just rhetoric to invoke emotion or xenophobia. Because if you're saying the real issue has nothing to do with their status as foreign companies, but has to do with there isn't a taking here, and even if they were the U.S. individuals, not a foreign company, they still wouldn't be entitled to compensation. Certainly the fact that they are foreign companies is relevant here. But that doesn't mean that U.S. nationals have an unfettered right to sue Libya as well. They did for six months. For six months they did have an unfettered right to sue Libya, and they acted within that time. And did everything the statute required them to do. But that doesn't mean they have a property interest in rules of sovereign immunity, and it doesn't mean that they have a reasonable expectation in being able to pursue that claim against Libya, because they know that legal claims may be settled by the United States, may be espoused by the United States at any time, depending on our relationship with a foreign nation. And who benefits and who doesn't benefit may be entirely fortuitous. But just so we're clear, it wouldn't have mattered. The government's position would be identical whether these were U.S. individuals, as opposed to foreign corporations, with regard to whether or not there's a compensable taking. I wouldn't say our position would be identical. Our arguments would not be identical, but we would be saying, yes, I think as a general matter, no taking would occur in that circumstance. Okay. Is there anything further? Thank you. Thank you. Two minutes of rebuttal time. Thank you. And I apologize for running over. It's a fascinating case. Very quickly, in answer to Judge Stoll's question about whether these cases could actually be brought to maturity, won and enforced, I direct you to the record. At document 37, page 32, the first two lines of that page and note 7 at the bottom of the page. Did you say document 37, page 2? Do you have a JA reference site for me? It is our reply brief. I'm sorry. My documents are printed as document 37. It's the reply brief of the appellants above at page 32. Just so you know, how our documents are organized is by JA number in the joint appendix. That's usually how we refer to things. I'll get the site to the clerk's office afterwards to make sure we're talking about the same page and notation. Brace talks about investment-backed expectations and looking at investment-backed expectations throughout the history of the prosecution. In this case, what would be the history of the prosecution of these claims? At no time was the conduct of the government post-espousal their decision to use all of the funds to compensate other parties, including $209 million going to parties who hadn't even filed claims at the time of the espousal. I promised I would keep this very short. I'm going to sit down. I would say this has been a very cooperatively litigated case with Mr. Preheim's office. Where we do agree is this case is very important. It is going to affect the way espousals are conducted going forward, irrespective of who wins and who loses. I would simply close by saying what happened here is not foreseeable. It is unique in U.S. espousal law. If you decide to affirm Judge Wheeler's decision below, you are going to have to do it by making new law. This has never happened before. It has never been addressed in a case either before the Supreme Court or before this Court. Thank you. I thank both counsel for their arguments.